How do you pronounce it? Ptasznik v. University of Pennsylvania. Mr. Bell and Mr. Myers. Yes, sir. Come right up. Good morning and may it please the Court. I'm James Bell on behalf of the appellant, Dr. Ptasznik, in this matter. I would respectfully request that five minutes of my oral argument time be reserved for the rebuttal. It looks here, just generally speaking, as if what happened is you had a person who came here in 2000 and he left at the end of April of 2008. And, you know, he had some personality issues with some of the doctors. One of the guys who was close to him at the beginning, Dr. Gewertz, really, there was a pretty sour relationship toward the end. What do you see in the record here that tells us that there is something significant with regard to out-and-out discrimination? I mean, you've got the Gewertz comment that Dr. Emerson likes younger people. That was 2001 or 2002. And you've got Emerson's comment, I think, made in April of 2005 that we need to take care of young people here at Penn. But that's way back. It's true, Your Honor, that those are remote in time from the point when Dr. Ptasznik actually left Penn. It is not true, however, Your Honor, that those statements are remote in time from when Dr. Gewertz, Ms. Mulhern, and Dr. Emerson put in motion the plan to remove Dr. Ptasznik from his position and began to act on it. If, for example, there was a decision supposedly made in 2005 to give Ptasznik a terminal appointment, that's time-barred, isn't it? If it's 2005, it has to be. The interesting thing about this, and I've seen, of course, my opponents' brief where they claim that terminal appointment is just language that's thrown around all the time and doesn't necessarily mean what it says. The reason why I know for sure that the final appointment was a terminal appointment was because, in fact, it was his terminal appointment. I'm not sure that, at the moment, that you're given the terminal appointment, even though that certainly was what was reflected by the notes of Dr. Pope, to whom my client had complained in his conversations with Ms. Mulhern. I'm not sure that, to the observer on the inside, in this case, my client, Dr. Ptasznik, that it was obvious that this was necessarily his terminal appointment, clearly from the communications at the period of time in 2007. Well, if it's obvious it's not a terminal appointment, then he's not terminated at that time. Is that correct? He was terminated at the end of that appointment, Your Honor. Okay, but for purposes of argument here, there's got to be a termination date. What date are you picking as the date he was terminated? July of 2008, Your Honor. Not April of 2008. April of 2008. Okay. In other words, well, what evidence do you have? You say you have direct evidence that he was terminated, and we don't have to have the McDonnell-Douglas test. What direct evidence do you have that he was terminated in 2008? The direct evidence that we have, Your Honor, is that the employer was either placing a substantial negative reliance upon age in the making of decisions related to his employment, or that those decisions and those statements indicate some form of but-for causation in the form of, you have Dr. Emerson saying that he's making decisions about his age. He's making decisions regarding my client, specifically with respect to his age. We have younger, better faculty to take care of. That when asked about opportunities to move away from Dr. Emerson and his department, that he's told that he will not be taken care of or given space for his R01 grant research because, in this case, Dr. Green, the head of another department, also had younger faculty to take care of, which is what was communicated to him. It was communicated to him by his direct supervisor and mentor a few years earlier that he should expect this kind of age discrimination from his second-level supervisor in the form of discussions about his future at Penn and information being given to him that Steve, meaning Dr. Emerson, liked to promote younger people. Who replaced him that was younger than him and did his job? Who did his job that replaced him? I believe that the replacement question is a difficult one, Your Honor. Well, it's one you've got to meet. They claim he was never replaced. They do claim that he was never replaced, Your Honor. And they say that's the end of that job and you just can't say the fact that they didn't replace him spells out that they discriminated against him. There's approximately three parts to that. I'm sorry, Your Honor. Go ahead. I believe there's three parts to how you would look at that argument, Your Honor. The first is that I believe there's evidence that to the extent that any portion of Dr. Poshnick's job was continued by Penn, that he was replaced in that job. Specifically, during the oral argument, Mr. Myers represented to the court that of the 20% of the work that my client was performing at that time for Dr. Coleman, that some portion of that work was picked up by the person who was already working for Dr. Coleman in his lab. We've identified that person. Her name is Dr. Malik. She's 37 years old. Yeah, but doesn't the evidence show that all those people did functions other than what your client was doing? Your Honor, if it's… Is there a question of fact that they did something, that they did what your client was doing? With respect to replacement, Your Honor, unless it's a direct replacement of job for job, there's always a question. Even assuming they didn't one for one replacement, but taking the three that came in, what evidence is there that they were doing his work and that together or individually, they replaced him in the sense that they did the work that he formally did? There is not evidence that they did the work that he did, Your Honor. The evidence is that Penn continued to seek out individuals with the qualifications that my client had, those being the qualifications that Penn prized enough in order to designate someone a research assistant professor. And they hired people in the same department that my client, Department of Medicine, that my client worked in, and they hired those people who were younger. You mentioned Dr. Malik, but I thought Dr. Coleman testified she was there for just a short period of time, and then she went, I think, to like University of Chicago or somewhere, and all she did was do some cleanup. It is true that Dr. Coleman testified that she was only there for a short period of time, but the record evidence, which is part of the appeal, includes Dr. Malik's own testimony in the form of affidavit that she was there for approximately 16 months following Dr. Pochnick's termination. So it wasn't a very short period of time. But she did her own work on her own projects, right? That was the conclusion, Your Honor, that Judge Buckwalter drew below. It did not, in my humble estimation, comport with the testimony given by Dr. Coleman. Dr. Coleman testified that she continued the projects, including the project that she'd been working on with my client. In addition, Mr. Myers made that representation at the summary judgment argument, and that transcript is also before the court. Is there any evidence that Pope or Mulhern were involved in any way in the decision to terminate your client? Your Honor, with respect to Ms. Mulhern, there might be not such good blood there, but what was in their capacity to terminate your client? With respect to Pope and Mulhern, it's not clear that Dr. Pope, apart from passing on information about the complaint at some point between being given the complaint in June 2005, had any further action with this. So why do we raise it if he had nothing to do with his termination? I'm sorry, Your Honor, I don't understand the question. Why is he even involved? Isn't it really Bennett and Shannon? Dr. Pope is involved because he was a clear representative of Penn, who at the earliest stage of my client's complaints was given a complaint about discrimination. But he's not a decision maker. He was not the ultimate decision maker. Who was the decision maker? It is unclear to what extent Dr. Emerson participated in the decision or influenced the decision. I didn't ask you who wasn't or who's unclear. Who was the decision maker? It's been represented that Drs. Bennett and Shannon were the decision makers with respect to my client's termination, Your Honor. Does that mean they were? You said it's been represented. I'm not sure if you're telling me that they were. They were entirely responsible. Who do you say was the decision maker or were the decision makers? I believe that in addition to Drs. Bennett and Shannon, that the decision was influenced by both Ms. Mulhern and Dr. Emerson. All right. So if I understand what you just said, Bennett and Shannon were the decision makers, but they were influenced by Emerson and Shannon. Yes, Your Honor. What record evidence demonstrates that that was the case? The record evidence that demonstrates that Ms. Mulhern was involved with the decision is that as soon as the complaint was made, within days of the complaint being made, there are representations in Dr. Pope's notes that Ms. Mulhern was speaking to the dean about a terminal appointment for my client that he needed to leave, she said, in two different points, either within one year or coterminous with the end of his grant, and that she was making that recommendation. Because that's exactly what happened, we think that a reasonable fact finder could determine that her recommendation and discussions with the dean were actually followed. With respect to Dr. Emerson, there are conversations with... When did he leave to become president of Haverford? I believe it was a year or two before the termination of my client, but not before being involved in creating and forwarding the terminal appointment for my client. Why don't we hear from your opponent, and then we'll get you back on rebuttal. Yes, Your Honor. Good morning, Your Honors. I'm John Myers. Instead of doing what I thought I was going to do, I think I should address some of the questions that you asked, Mr. Bell. Let me start from the last thing you were talking about, which is the role of Mulhern and Pope. There's nothing in the record to suggest that Pope had anything to do with any of the decisions here. The suggestion is that he influenced the decision-maker. What's that? The suggestion of your friend across the aisle is that they influenced the decision-maker. Yes. So with respect to Dr. Pope, the plaintiff attempts to create an issue of fact which is not a material issue of fact, which is what exactly he told Dr. Pope, the ombudsman. The relevant fact is what Dr. Pope told other people. There's no evidence at all that Dr. Pope weighed in on a decision to terminate, extend, or any of that. He was involved several years earlier in a dispute over the way the plaintiff was being treated, whether there was space, whether Penn could find another mentor for him because of his position. The background here is that the position is not a tenure-track position. It's a 10-year limited-term position, research assistant professor. Did you say 10-year? Tenure is the absolute maximum. So he was there eight, almost eight. And he was there almost eight. And it's an odd position from the outside in the sense that these are positions on which Penn does not take financial responsibility for funding. And that's why in each of the appointments, 2000, 2003, 2006, it is made clear that there is a maximum term which is either the end of the years or the end of funding. One of the doctors had said that the reason that they needed this space, because it turns out his space remained unoccupied after he left in April of 2008. Well, there's no doubt that there was a transition with respect to the space. You can't just flip, if you will. It's not like buying a house where I can move into more. There was a transition in the space. And there is a way to look at this that says, oh, well, gee whiz, Penn. I mean, he must have like millions of square feet. But the fact of the matter is that the department, I mean, everybody's in a department. The department didn't have the space. The department got space because Dr. Coleman agreed. Well, how soon after 2008 was the space that was left by Mr. Pojnik? How soon thereafter was it occupied? Within, I believe, a year or a year and a half. And I'm not sure that that is specific in the record. Well, how about his position that although he wasn't directly replaced, that he brought in three other people, each of whom did a share of what he formerly was doing before, all of whom were younger than him? That's not actually correct, and it's not what the record says. Nobody was brought in. There were people working in the labs. There was a cleanup at the end. The issue, and the focus has to be on the 80%, which was really the job. The grant ended, which ended the research. There was no continuation, period. So there was no, nobody was brought in. There's no evidence that anybody was brought in. There were people there who did cleanup. But the essential job, which was the specific blood research covered by a grant, wasn't continued, isn't being continued, because there was no funding to continue such research. Now, did Dr. Coleman hire someone to replace Pojnik? No. There's no evidence that he did. I mean, if the question is, at this point, does Dr. Coleman have other people in his group, I'm not able to answer that. There's nothing in the record on it. If the question is, did he hire somebody to replace Dr. Pojnik, the answer is there's no evidence that he hired anybody. One of the problems here is that the plaintiff wants to paint with a very broad brush and say, well, there were all these other researchers. Well, that really proves too much, because what it really says is, here was a man brought in on a specific basis as a non-tenure track externally funded person to support Dr. Gewertz in 2000. That didn't work out for reasons that didn't have anything to do with age. They were at each other. So it didn't work out. So what was Penn's response? Penn's response was to try and help him out. And the people who tried to help him out then become the enemies in the litigation. So Mulhern and Coleman and others, it's clear in the record, came up with a plan, which wasn't exactly why he was hired, but, okay, we can work this out. Dr. Coleman would take him on on a temporary basis. They could find office space for him. And he could continue while looking for a job, which was clear from the earliest days that he really needed to move on. And there were no punches pulled. Everybody said it, it's in the record, six or eight times. So they did that. And now Coleman taking him in and getting him space is somehow turned into an act of discrimination. Now, the other thing about Mulhern, in addition to the fact that she's probably thrilled to know she's now become a key decision maker in the medical school, is that the conversations in which she was involved and the e-mails in which she was involved were the early ones, 2004, 2005. And this goes back to the point that you raised with Jim. If it was a terminal appointment, you're out. If it wasn't a terminal appointment, then you have to look at what Bennett and Shannon did. And those e-mails. The only thing I know of with Mulhern is that she actually said in 2005, 2006, you need to renew him probably for another year or two at least. That's right. So, you know, was it a terminal decision? There is no doubt that anybody reading the correspondence and the appointment would know, in Dr. Pagenik's situation, that he needed to find other employment. But he was given a very long period of time within which to do that. He was also given a tremendous amount of assistance. They got him the lab space. There are dozens of letters of recommendation, including from the decision makers, to other people, which both tout his expertise and give a pretty good explanation of why he's looking, because he's in this time-limited place. All of that, of course, is now somehow evidence of discrimination. But Mulhern's not in the 2007, and you asked when was the termination. I think you would have to say that when he was notified in the fall of 2007, there's a letter from Dr. Bennett, a letter from Dr. Shannon. September of 2007. September and October. Yeah. He's clearly told this is it. The others, going back, are really repeats of language that is standard in these appointment letters. You only have, if you look at 2000, you only have until 2003. It's conditioned on funding, so forth and so on. So let me just see if there's something else I really feel like I need to cover. Unless you have questions, I really think. I have no further questions. Okay. Thank you. Mr. Bell. You suggested that the McDonnell-Douglas framework does not apply. What then do you have to do to show the survived summary judgment? Your Honor, I would just clarify. It's not that I don't think that the McDonnell-Douglas standard applies. It's that with respect to the McDonnell-Douglas standard, and in McDonnell-Douglas itself, for example, Your Honor, the court has observed that that fourth prong is to show that the termination or other adverse employment action occurred under circumstances giving rise to an influence of discrimination. What you do as a jurist in order to find something probative, a probative test to substitute for that language if someone believes that that's necessary, is something that the Third Circuit has indicated ought to be flexible, certainly ought to be flexible in the context of the rift. I think Judge Ambro has asked you. You stated, not he, that you have direct evidence that he was discriminated against, which would mean we don't have to go through the McDonnell-Douglas steps. What is the direct evidence that Judge Ambro would like to hear from you that you have that he was discriminated against? The direct evidence primarily relates to the negative age-related comments that were made by Dr. Emerson and the comments made by Dr. Gewirtz about Dr. Emerson and the comment made by Dr. Emerson about the age-related animus of other managers at Penn. And if Emerson were the decision-maker, we probably wouldn't be here, right? I mean, that's your challenge, it seems to me, is that we see a fair amount of cases where inappropriate comments that are actionable under the civil rights laws are made, but not always are those made by the decision-makers. And then your challenge as plaintiff's counsel is to tie together the two, correct? Agreed, Your Honor. And help us see how you can tie the two together here, because you've got issues with remoteness in time, you have Emerson leaving to go to Bryn Mawr, et cetera, et cetera. If those statements were strong enough, taken on their own, that they indicated one of the two tests that's floating around out in the Third Circuit, either that the employer placed substantial negative reliance upon age in the decision or potentially, in light of the recent Supreme Court decision, the 2009 Supreme Court decision, but for causation, at least as but for causation in age discrimination is understood, then I believe we would move immediately to the next phase. In this instance, because we no longer have the Pricewaterhouse shifting, one would imagine that we would begin to look at a reasonable articulable, an articulated reason, non-discriminatory reason from the employer, and then ask whether or not there was pretext. You have to almost make out a cat's paw argument, don't you? I mean, that these ageist comments that you've cited caused the decision-makers to do what they did. And I'm just not seeing that anywhere in the record. I'm not sure if you're... what you need to survive summary judgment. If you decide that Dr. Emerson was not a decision-maker or that there's not a material factual dispute about whether Dr. Emerson was a decision-maker, then you might have that problem. Our argument with respect to Dr. Emerson's participation is he is the person who signed off on the final appointment up to COAP, and in terms of that, even that action shows some animus, which is at the time that he made that request to the board that would approve it, he sought only one year. He sought a period of time that was less than the time that was remaining on Dr. Poshnick's funding. And the board came back and said, well, wait a minute. Is it one year or two years? It was one year in one portion of the letter and two years in another portion. They said, well, okay, it's two years. And then they got the two years. So he was terminated on the schedule that was set by Dr. Emerson when he did this. In terms of the cat's paw argument, Your Honor, there is a mystery which, unfortunately, Dr. Emerson wasn't able to solve for me during his deposition, which is immediately preceding the letters in September and October that were sent to my client, indicating that, in fact, that the appointment would be terminal. There is a flurry of e-mails from Dr. Emerson's e-mail account to the decision-maker's office regarding Dr. Poshnick and events that had occurred in 2005. Dr. Emerson claims that he doesn't remember sending them. There is no record evidence of any reason why Dr. Emerson, and they were sent from Dr. Emerson's e-mail, and there's no record evidence of why Dr. Emerson would be communicating with the decision-makers at that point about Dr. Poshnick. And Dr. Emerson claims not to remember what that reason was. But in terms of the timing of it, it's years after the last appointment. It's at a time when Dr. Emerson is no longer physically present at the University of Penn. In fact, he's off doing his job at Haverford. It's significantly before Dr. Poshnick files his grievances with the University. It's not relevant to anything. And because he's sending these e-mails that are about sort of negative situations involving my client at exactly the time that he gets terminated, we believe that there's record evidence that he was trying to, at a minimum, he was trying to influence the determination. We believe that he influenced the determination or was part of the decision-making because he was the one who made the recommendation that it be the last one. It was the last one, and at the time when the letters went out, he was sending e-mails to the decision-makers about negative things about my client. Okay. Thank you very much. Thank you. Thank you to both counsel for well-preparedness.